UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GREENWOOD PLACE, LP and,<br>GREENWOOD PLACE PHASE II, LP,<br><br>Plaintiffs,<br><br>vs.<br><br>THE HUNTINGTON NATIONAL BANK<br>and NATIONAL CITY BANK OF<br>INDIANA,<br><br>Defendants. | Case No. 1:09-cv-1110-TWP-TAB |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants' – The Huntington National Bank ("HNB") and PNC Bank, National Association, successor to National City Bank ("NCB") (collectively, "Defendants" or "Lenders") – Motion for Summary Judgment. The present motion springs from a declaratory judgment action brought by Plaintiffs – Greenwood Place, LP and Greenwood Place Phase II, LP (collectively, "Plaintiffs" or "Borrowers") – seeking a declaration of the rights and obligations of Plaintiffs and Defendants under a Master Loan Agreement ("MLA") and a related Project Agreement. For the reasons set forth below, Defendants' Motion for Summary Judgment [Dkt. 38] is **GRANTED**.

## I. BACKGROUND

In 2005, Lenders attempted to woo George Broadbent by offering his business entities a $50,000,000 line of credit to develop commercial real estate. In the process, on February 6, 2006, the parties devised a "Term Sheet" ("Term Sheet"), which purported to set forth key terms and conditions of the proposed transaction. On February 23, 2006, Lenders and The Broadbent

Development Company ("Broadbent Development") finalized a deal, albeit one that deviated from the Term Sheet quite significantly. This deal is embodied in the MLA, which stands at the heart of the present dispute.

**A.      The MLA's Terms**

Article 2 of the MLA, titled "**THE LOAN**," establishes the terms for loans made pursuant to the MLA. Specifically, under Section 2.01, Lenders agreed "to make Project Loans to the Borrower(s) [which were to be designated by Broadbent Development] from time to time in an aggregate principal amount not to exceed [$50,000,000] outstanding at any time." (emphasis added). Section 2.01 continues, "The proceeds of a Project Loan will be advanced to the Borrower thereunder as acquisition and construction of the Project . . . progresses, in accordance with and subject to the requirements and limitations set forth herein and in the other Project Loan Documents for such Project Loan." Section 2.02 begins, "In connection with a request for approval for a Project Loan, which approval the Lenders may withhold in their reasonable discretion, Developer shall submit . . . such information as the Lenders deem reasonable, appropriate and necessary with respect to such Project Loan . . ." Section 2.02 also contemplates that Lenders and Borrowers will execute a "Project Agreement" in connection with each Project. Section 2.06 provides that each Project Loan has a maturity date of 36 months, but also allows the maturity date to be extended for an additional period of 60 months, provided no default has occurred and the Project's "Debt Service Coverage Ratio" is within certain defined parameters.

The MLA is replete with defined terms, many of which are germane to the present dispute. These include:

!         <u>Project</u> is defined as "a Project Site and the Improvements located or to be constructed thereon."

!         <u>Project Loans</u> are defined as "the amount of the Loan approved by the Lenders and allocated to pay Project Costs for such Project, as shown on the Cost Breakdown for such Project and reflected in the Project Notes and the Project Agreement for such Project."

!         <u>Project Costs</u> are defined as "the Direct Costs and Indirect Costs for such Project."

!         <u>Direct Costs</u> involve the Borrower's Project Costs related to "work, labor, or materials furnished in connection with the construction of such Project."

!         <u>Indirect Costs</u> involve the Borrower's Project Costs "in connection with or incidental to the construction of such Project other than Direct Costs," such as "the costs of acquisition of a Project Site, costs of title examination and insurance, costs of surveys, [etc.] . . ."

Article 4 of the MLA – specifically, Section 4.01(p) – is central to the present dispute. It reads as follows:

## ARTICLE 4.
## <u>CONDITIONS OF LENDING</u>

By acceptance of a Project Loan, the Borrower thereunder agrees that the <u>obligation of the Lenders to make an Advance in respect of such Project Loan is subject to</u> the accuracy in all the material respects, as of the date hereof and the date of each Advance in respect of such Project Loan, of the representations and warranties contained herein and under the Project Loan Documents for such Project Loan, to the performance by the Borrower under such Project Loan of its agreements to be performed hereunder and under the Project Loan Documents for such Project Loan on or before the date of each Advance, and to <u>the satisfaction of the following further conditions</u>:

    4.01. <u>Initial Project Loan Advance</u>. Prior to the initial Advance by the Lenders with respect to such Project Loan:

. . .

    p. <u>Appraisal</u>: The Lenders shall have received an

appraisal of the fair market value of the Project in respect of which of such Project Loan is being made, on an assumed completion basis with respect to a Project (the "Appraisal"). The Appraisal shall be made by an appraiser approved by the Lenders, shall be in form and substance satisfactory to the Lenders and shall be in compliance with all applicable laws, rules and regulations; such Appraisal shall reflect a Project Loan to value of not more than the following:

| Product Type | Construction-LTV | Mini-Perm-LTV |
|---|---|---|
| Land Loan – Raw | 65% | NA |
| Land – Improved | 75% | NA |
| **Retail Center** | **80%** | **85%** |
| Self-Storage Facility | 75% | 80% |
| Outlot Retail Center | 75% | 75% |

. . .

(Emphasis added).

LTV is a reference to "loan to value" ratio, which compares the amount of money loaned to the appraised value of the Project at the time of the initial loan.

Finally, Article 5 of the MLA, titled "**DISBURSEMENTS**," establishes that by accepting a Project Loan, the Borrower agrees that "Advances of such Project Loan shall be made in accordance with [certain] requirements and limitations." One limitation is found in Section 5.01(b), titled "Borrowing Limitations." Section 5.01(b) clarifies that "Advances of such Project Loan shall be made only to defray Project Costs attributable to such Project and described in the Cost Breakdown for such Project and actually incurred by such Borrower." (emphasis added).

**B.    The Road to Litigation**

Broadbent Development designated Plaintiffs as Borrowers under the MLA. Plaintiffs and NCB (acting for itself and as an "Agent" for Lenders), entered into a Project Agreement on
4

May 5, 2006.[1] Pursuant to the Project Agreement, which expressly incorporated all of the MLA's terms, Lenders agreed to make Project Loans to Plaintiffs in connection with the redevelopment of roughly 28 acres of real estate in Indianapolis, Indiana, for the construction of a 175,513 square foot retail facility ("Greenwood Place Project"). Accordingly, Lenders provided two loans: (1) a construction loan to Greenwood Place, LP in the amount of $16,800,000 to fund the construction and renovation of phase one of the Greenwood Place Project; and (2) a term loan to Greenwood Place Phase II, LP, initially in the amount of $2,000,000 and later increased to $4,063,636, to fund construction and renovation of phase two of the Greenwood Place Project (collectively, the "Loans"). The Loans are evidenced by multiple promissory notes, which are, in turn, secured by mortgages, assignments of rents, and leases. Pursuant to the MLA, Borrowers submitted a "Cost Breakdown" of all "Project Costs" for the Greenwood Place Project. By January 2009, the construction and renovation for both phases of the Greenwood Place Project were completed as contemplated by the "Cost Breakdown." By then, the Loans had been fully advanced, except for a small sum relating to administrative expenses.[2]

The original maturity date of the Loans was May 5, 2009. Before that date, however, pursuant to Section 2.06 of the MLA, Plaintiffs extended the maturity date for an additional period of 60 months, to May 5, 2014. In doing so, Plaintiffs effectively converted the Loans from construction loans to "mini-perm" loans, as set out in Section 4.01(p).

According to Plaintiffs, once this occurred, Section 4.01(p) required Lenders to advance

---

[1]This Project Agreement was later modified on August 22, 2006.

[2]By May 2009, the Loans were fully advanced.

sufficient additional funds to bring the loan-to-value ratio up to 85% of the appraised value. Plaintiffs point to numerous pieces of extrinsic evidence, including the Term Sheet, to back this position. Thus, pursuant to the MLA, Plaintiffs argue, Lenders must advance an additional $2,400,864. On February 9, 2009, Plaintiffs made this request, stating "there are no restrictions in the loan documents that allow the lender to specify how the funds are to be used." After some back and forth, Lenders denied the loan, leading to the present lawsuit. Lenders now move for summary judgment, claiming that the MLA is unambiguous and in no way amounts to a credit agreement that requires Lenders to make a $2.4 Million "equity" loan unrelated to Project Costs. Additional facts will be added below as needed.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). Neither the mere existence of some alleged factual dispute between the parties, nor the existence of some metaphysical doubt as to the material facts will

defeat summary judgment. *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted). "Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate." *Slutsky-Peltz Plumbing & Heating Co., Inc. v. Vincennes Cmty. School Corp.*, 556 N.E.2d 344, 346 (Ind. Ct. App. 1990) (citation omitted).

### III. DISCUSSION

Given that this case is based on diversity jurisdiction, the Court must apply Indiana law to determine the effect of the MLA (as well as the Project Agreement and Term Sheet). Indiana law is clear that "credit agreements" – like the MLA at issue – must satisfy specific criteria. The Indiana Lender Liability Act ("<u>ILLA</u>") defines a credit agreement to include agreements to "lend . . . money" or "otherwise extend credit." Ind. Code § 26-2-9-1. Significantly, the ILLA is a statute of frauds that imposes three requirements on credit agreements. That is, a debtor may assert a claim for legal or equitable relief arising from a credit agreement, only if that commitment: "(1) is in <u>writing</u>; (2) sets forth all <u>material terms and conditions</u> of the credit agreement . . . ; and (3) is <u>signed</u> by the creditor and the debtor." Ind. Code § 26-2-9-4; Ind. Code § 26-2-9-5 (emphasis added); *see also Ohio Valley Plastics, Inc. v. National City Bank*, 687 N.E.2d 260, 264-65 (Ind. Ct. App. 1997) (granting Bank's motion for summary judgment on Borrower's claim to impose damages for breach of an oral agreement to extend credit to fund business acquisition). Lenders argue that because there is no statutorily sufficient credit agreement contemplating a $2.4 Million loan untethered to Project Costs, they cannot be compelled to extend such a loan.

Plaintiffs counter that the MLA, Project Agreement, and Term Sheet, *<u>analyzed together</u>*,

constitute a single credit agreement that comports with the ILLA and compels Lenders to make the demanded loan. To buttress this claim, Plaintiffs highlight that under Indiana's statute of frauds,[3] a written agreement may consist of more than one writing, if each writing includes the required signatures and indicates it is related to the same transaction. *See Newman v. Huff*, 632 N.E.2d 799, 803-04 (Ind. Ct. App. 1994) (statute of frauds satisfied by real estate documents and provision in will, which must be read in concert). Based on this principle, Plaintiffs argue that the tripartite credit agreement satisfies the ILLA because the Term Sheet contains all material terms and conditions requiring Lenders to make a $2.4 Million loan. Indeed, the Term Sheet expressly provides that Borrowers could "elect [] to increase the Mini-perm loan amount to 85% LTV," which equates to $2,400,864 – the amount Plaintiffs demanded. Significantly, however, neither the MLA nor the Project Agreement spelled out the loan terms in this fashion. According to Plaintiffs, these omissions are not fatal: "When read together, these provisions of the Term Sheet and the MLA document the Banks' commitment to increase the amount of Plaintiffs' loans from 80% loan-to-value to 85% [i.e. $2,400,864] when the loans qualified for the 60-month extension of their maturity date." [Dkt. 84 at 32].

While this argument is well-crafted and well-taken, the Court is not persuaded. Plaintiffs' entire argument rests on the premise that the Term Sheet is part and parcel of a comprehensive credit agreement. For at least two reasons, however, this premise is fatally

---

[3]Lenders argue that a credit agreement under the ILLA requires a *single* writing. *See, e.g., Wabash Grain, Inc. v. Bank One*, 713 N.E.2d 323, 326 (Ind. Ct. App. 1999) (single document required to satisfy ILLA's statute of frauds; "To effectuate an agreement to lend money, the parties . . . must put in writing all the materials terms and conditions of the agreement and then sign *that* agreement."). Given the Court's ruling, however, it need not assess the strength of this argument.

flawed.[4]

First, the MLA does not reference, let alone incorporate, the Term Sheet. To incorporate a separate writing for purposes of the statute of frauds, one document must refer to the other. *Block v. Sherman*, 34 N.E.2d 951, 954 (Ind. 1941) ("It seems to be well settled that a memorandum, in order to make another writing a part thereof, so as to constitute a part of the contract, must refer to such other writing; and that parol proof of the connection of the papers is not admissible to establish a contract required by the statute of frauds to be in writing.") (citation and internal quotations omitted); *see also Wells Fargo Bank v. Tippecanoe Associates, LLC*, 923 N.E.2d 423, 429 (Ind. Ct. App. 2010) ("What we must determine . . . is whether the signed Mortgage so clearly and definitely refers to the unsigned cross-guaranty that by force of that reference, the cross-guaranty becomes a part of the Mortgage."). Given the MLA's failure to even mention the Term Sheet, there is simply no suggestion that the MLA sought to incorporate it. Tellingly, by contrast, the MLA specifically contemplates, references, and defines forthcoming Project Agreements. What is more, the Project Agreement itself states, "All of the terms, provisions and conditions of the [MLA] are hereby incorporated herein by reference as if fully set forth herein." These sophisticated parties obviously knew how to incorporate the terms of one agreement into another. The MLA's silence as to the Term Sheet speaks volumes.

Second, the Term Sheet cannot serve as an integral component of the credit agreement because, as evidenced by the Term Sheet's express language, it is non-binding on the Lenders.

---

[4]Lenders also dispute that Plaintiffs signed the Term Sheet. Indeed, the Term Sheet and the MLA were signed by Broadbent Development, not Borrowers. In light of the Court's ruling, it need not assess the validity of this argument.

The top of the first page states, "For Discussion Purposes Only" and "Not A Commitment to Lend." The final page reinforces that the Term Sheet is merely a precursor to a final lending agreement:

> This summary of terms and conditions is provided for discussion purposes only and does not constitute an offer, agreement or commitment to lend. The approval of this request is subject to the completion of due diligence procedures, credit approvals, mutually agreed upon loan documentation and other terms and conditions determined by lender.

By its own terms, the Term Sheet evinces an unmistakable intent not to bind. Consequently, Plaintiffs cannot transform the preliminary Term Sheet into a pivotal leg of a credit agreement that comports with the ILLA. *See, e.g., Indiana Hi-Rail Corp. v. CSX Transp., Inc.*, 818 F. Supp. 1254, 1260 (S.D. Ind. 1993) ("When, as in the present case, the parties incorporate language into the documents . . . which clearly indicates their *intent not to be bound* unless and until they execute a formal written document, such language will generally be given effect by the courts."); *Feldman v. Alleghany International, Inc.*, 850 F.2d 1217, 2121-22 (7th Cir. 1988) (applying Illinois law; letter of intent was non-binding when it stated that the parties "understood that this is not a binding agreement and the obligations and rights of the parties shall be set forth in the definitive agreement executed by the parties"). Accordingly, the Term Sheet cannot be considered as a component of the credit agreement.

With the Term Sheet jettisoned from the equation, the Court must review the MLA and Project Agreement to determine if they set out the material terms and conditions of the $2.4 Million loan demanded by Plaintiffs. Plainly stated, such terms and conditions are nowhere to be found. Plaintiffs repeatedly make hay about Section 4.01(p) of the MLA, arguing that it was "intended" and "understood" to obligate Lenders to make the loan. The Court respectfully

disagrees. Section 4.01(p) is found in Article 4, titled "Conditions to Lending." That Article lists prerequisites that Borrowers must meet before the Lenders make loans; it does not pertain to Lenders' obligations. Plaintiffs' proposed interpretation of Section 4.01(p) would turn the entire MLA on its head. Ultimately, there is no "writing" under the ILLA that supports Plaintiffs' claim that it is entitled to a $2.4 Million loan, and Plaintiffs' attempt to cobble together a credit agreement aligning with their position falls short. Accordingly, Lenders cannot be compelled to make the $2.4 Million loan.

In light of the Court's ruling, it need not address issues relating to ambiguity or integration raised by the parties.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Dkt. 38] is **GRANTED**. A separate judgment shall issue accompanying this order.

SO ORDERED: 01/25/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Copies to:

**Rex E. Bennett**
FROST BROWN TODD LLC
rbennett@fbtlaw.com,vhilgert@fbtlaw.com

**Jacob V. Bradley**
FROST BROWN TODD LLC
jbradley@fbtlaw.com,award@fbtlaw.com

**Darren Andrew Craig**
FROST BROWN TODD LLC
dcraig@fbtlaw.com,jwhitaker@fbtlaw.com

**Phil L. Isenbarger**
BINGHAM MCHALE, LLP
pisenbarger@binghammchale.com,jibsen@binghammchale.com

**Richard A. Kempf**
TAFT STETTINIUS & HOLLISTER LLP
rkempf@taftlaw.com,docket@taftlaw.com,kmickel@taftlaw.com

**Nathan Lee Lundquist**
BINGHAM MCHALE LLP
nlundquist@binghammchale.com

**James M. Matthews**
FROST BROWN TODD LLC
jmatthews@fbtlaw.com,dacree@fbtlaw.com

**Whitney L. Mosby**
BINGHAM MCHALE LLP
wmosby@binghammchale.com,mmcclain@binghammchale.com

**Peter Jon Prettyman**
TAFT STETTINIUS & HOLLISTER LLP
pprettyman@taftlaw.com,docket@taftlaw.com,pkeener@taftlaw.com

**Thomas C. Scherer**
BINGHAM MCHALE LLP
tscherer@binghammchale.com,mmcclain@binghammchale.com

**Steven C. Shockley**
TAFT STETTINIUS & HOLLISTER LLP
sshockley@taftlaw.com,docket@taftlaw.com,kmickel@taftlaw.com