# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| GREENWOOD PLACE, LP and GREENWOOD PLACE PHASE II, LP, | ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | |
| v. | ) ) | Case No. 1:09-cv-1110-TWP-TAB |
| THE HUNTINGTON NATIONAL BANK and NATIONAL CITY BANK OF INDIANA, | ) ) ) ) | |
| Defendants/Counter-Claimants. | ) | |

## ENTRY ON LENDERS' PENDING MOTIONS

This matter is before the Court on Counter-Claimants', The Huntington National Bank ("HNB") and National City Bank of Indiana ("NCB") (collectively, "Lenders"), Motion for Summary Judgment. Lenders have asked the Court to declare that Counter-Defendants, Greenwood Place, LP and Greenwood Place Phase II, LP (collectively, "Greenwood Place"), are in default because there has been a "material adverse change in the financial condition of" George P. Broadbent ("Mr. Broadbent"), the guarantor of a series of loans. To be sure, Mr. Broadbent has experienced an adverse change in his financial condition. Whether this change has been *material*, however, is a more difficult question. In the end, the Court finds that it would be premature to make this determination; therefore, Lenders' Motion (Dkt. 99) is **DENIED**. Also, for the reasons explained at the end of this entry, Lenders' Motion for Entry of Final Judgment (Dkt. 107) is **DENIED**.

1

## I. BACKGROUND

A. **The Master Loan Agreement**

In 2005, Lenders attempted to woo Mr. Broadbent by offering his business entities a massive line of credit to develop commercial real estate. On February 23, 2006, the Lenders and The Broadbent Development Company ("Broadbent") entered into a Master Loan Agreement ("MLA"). Pursuant to the MLA, Lenders agreed to make "Project Loans" to "Borrowers" designated by Broadbent "from time to time, in an aggregate principal amount not to exceed [$50 million] outstanding at any time." Pursuant to Section 2.01 of the MLA, "[t]he proceeds of a Project Loan will be advanced to the Borrower thereunder as acquisition and construction of the Project…progresses…". Further, Section 2.02 contemplates that Lenders and Borrowers will execute a "Project Agreement" in connection with each Project Loan.

B. **The Guaranty**

An important condition to Lenders making a Project Loan to a designated Borrower is the receipt of an executed Guaranty by a Guarantor. The Guaranty is an unconditional, continuing, and irrevocable guaranty of payment. Moreover, Section 2(d) of the Guaranty is a so-called "liquidity covenant," requiring that the "Guarantor…maintain liquid assets of not less than [$2 million]." Section 18 of the Guaranty further provides that in the event the maturity date of a Project Loan is extended as authorized by the MLA, the Guarantor's obligations will be reduced to 25% of the Project Loan. Finally, pursuant to Section 8 of the Guaranty, Guarantor "shall furnish to Lenders annual financial statements" that are "true, complete and correct in all material respects."

Mr. Broadbent is the sole Guarantor under the MLA and his financial condition is at the heart of the present dispute. Significantly, Section 8.01(l) of the MLA provides that "<u>any material adverse change in the financial condition of…a Guarantor</u>" constitutes an Event of

Default. Because Mr. Broadbent is the sole Guarantor, if he experiences a material adverse change in his financial condition, then a default has effectively occurred on *all* "Project Loans" – even if a given "Project Loan" is current. Obviously, Mr. Broadbent's financial condition was critical to the Lenders' extension of credit.

**C.     Greenwood Place Project Loans**

In the present case, Greenwood Place was designated as a Borrower under the MLA, entering into a Project Agreement with Lenders on May 5, 2006 (the "Greenwood Place Agreement"), which incorporated by reference all of the MLA's terms.[1] Under the Greenwood Place Agreement, Lenders agreed to make Project Loans in a total principal amount of $20,863,636.00 for the development of real estate in Indianapolis, Indiana. Mr. Broadbent, as Guarantor, executed and delivered Guaranties as required under the MLA. Subsequently, Mr. Broadbent provided to Lenders a personal financial statement dated January 1, 2007 for the 2006 calendar year. The key terms of this statement are summarized as follows:

- $7,250,592.00 of cash in personal accounts;
- No pending lawsuits or judgments;
- Net worth of $120,725,378.00;
- Income-producing real estate projects had a stated value of $327,948,386.00 with total loan balances on the projects of $265,550,693.00, meaning a total equity of about $62 million.

The original maturity date for the Greenwood Place Loans was May 5, 2009, but Lenders extended this date to May 5, 2014, pursuant to Section 2.06 of the MLA. This extension triggered Section 18 of the Guaranty, automatically reducing Mr. Broadbent's potential obligations to 25% of the amount of the Greenwood Place Loans. Thus, as it stands, Broadbent's

---

[1]The Greenwood Place Agreement was modified on August 22, 2006.

maximum exposure under the Greenwood Place Loans is just shy of $4.9 million. That said, Greenwood Place is currently in a stable financial position. In the first three months of 2011, Greenwood Place had a positive cash flow of $51,465.00 after payment of all expenses, including debt service. Greenwood Place contends that its likelihood of default is low – "certainly less than 25%."[2]

**D.     The deterioration of Mr. Broadbent's financial condition**

Unquestionably, Mr. Broadbent has suffered an adverse change in his financial condition since the 2006 Personal Financial Statement. Today, his financial condition can be summarized as follows:

- $3,000 in personal cash and annual expenses in excess of $1 million;

- Judgments totaling about $17 million;

- Net worth of roughly $48 million;

- Equity in commercial real estate projects of about $10 million.

In other words, since 2006, Mr. Broadbent's cash has decreased from over $7 million to roughly $3,000, his net worth has declined by roughly 60%, and his equity in real estate projects has declined by over 80%. And, for reasons that remain somewhat unclear, Mr. Broadbent has failed to satisfy any of the $17 million in judgments entered against him.

What is more, another judgment appears forthcoming. On March 11, 2011, the Lenders received a letter from Mr. Broadbent and The Broadbent Building, LP ("Broadbent Building," another Borrower designated under the MLA), acknowledging default on two more loans – an $11 million loan and a $3 million loan. Broadbent is a 25% Guarantor of the $11 million loan

---

[2]Greenwood Place repeatedly emphasizes this point. In the Court's view, however, this is a bit of a red herring. After all, any material adverse change in Mr. Broadbent's financial condition triggers a default on *every* "Project Loan" – not just the Greenwood Place loans.

4

and co-borrower of the $3 million loan. In response, Lenders accelerated the loans related to the Broadbent Building. Simply stated, Lenders expect to assert a claim against Mr. Broadbent for roughly $5.75 million based on the Broadbent Building and, therefore, it stands to reason that Mr. Broadbent will soon have about $22.75 million in judgments entered against him.

Further, since 2010, Mr. Broadbent has engaged in a series of financial transactions with his wife that have raised red flags for Lenders. Most notably, in January of 2010, Mr. Broadbent "gifted" to his wife five different real estate projects that had equity of over $22 million according to his own valuation methodology. These transfers were made for no consideration, thus reducing his net worth by $22 million. By way of affidavit, Mr. Broadbent testifies that these transfers were done for estate planning purposes, and were not designed to hinder, delay, or defraud his creditors.[3]

Given this backdrop, the Court is now called upon to determine if "any material adverse change" has occurred in Mr. Broadbent's financial condition, thus constituting an Event of Default under Section 8.01(l) of the MLA. Additional facts are added below as needed.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable

---

[3]The other transactions highlighted by Lenders can be found on pages 4 and 5 of their reply brief (Dkt. 117).

inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted). Generally, "construction of a written contract is a question of law for which summary judgment is particularly appropriate." *Slutsky-Peltz Plumbing & Heating Co., Inc. v. Vincennes Cmty. School Corp.*, 556 N.E.2d 344, 345 (Ind. Ct. App. 1990) (citation omitted).

### III. DISCUSSION

**A.    Indiana Contract Law**

In contract cases like this one, the court's primary objective is to effectuate the intent of the parties at the time the contract was made, which is determined by examining the language the parties used to express their rights and duties. *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 212-13 (Ind. Ct. App. 2007). The court must read the contract as a whole, construing language to give meaning to all of the contract's words, terms, and phrases. *Id.* at 213. Likewise, the court must accept a contract interpretation that harmonizes provisions, not

one that places provisions in conflict. *Id.* Here, the parties dispute the meaning of a contract provision, but this is hardly unusual. The law is well-settled that differing, self-interested interpretations do not create ambiguity. *See Ind. Dept. of Transp. v. Shelly & Sands, Inc.*, 756 N.E.2d 1063, 1069 (Ind. Ct. App. 2001). Instead, a contract is ambiguous only when it is "susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning." *Id.* at 1069-70. Absent ambiguity, the court must give the contract terms a plain and ordinary meaning. *Id.* at 1070.

**B.    Arguments**

It is readily apparent to the Court that Mr. Broadbent has suffered an adverse change in his financial condition. At first blush, it would appear that this change has been *material* as that word is used in common parlance.[4] Specifically, since 2006, Mr. Broadbent's cash has been depleted, his net worth has decreased by 60%, his equity in real estate has diminished by 80%, and he now has $17 million in unpaid judgments against him with over $5 million more forthcoming. Simply stated, if this isn't *material*, what is? Lenders also argue that a ruling in their favor will not jump the gun, as Indiana courts have shown a willingness to apply "materiality" standards as a matter of law. *See, e.g., Maxon Corp. v. Tyler Pipe Industries, Inc.,* 497 N.E.2d 570, 576 (Ind. Ct. App. 1986) ("Accordingly, we hold that Maxon's indemnity clause constitutes a material alteration as a matter of law."). Any way you slice it, Lenders argue, Mr. Broadbent's adverse change in financial condition has been material and well within the reach of the broadly-written Section 8.01(l). Moreover, a contrary ruling would "ignore the fact that [Mr.] Broadbent's real estate enterprise is in a state of virtual collapse." (Dkt. 117 at 9).

---

[4]Black's Law Dictionary defines material as ""[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential." BLACK'S LAW DICTIONARY 450 (3d pocket ed.).

7

The Lenders' position is well-taken. However, upon closer examination, the analysis is perhaps not so cut-and-dried. First of all, the term "any material adverse change" is undefined by the MLA. In a contract replete with sophisticated metrics and carefully defined terms, it is somewhat perplexing why the parties left such a potentially game-changing term so vague. Given its undefined and vague nature, the phrase "any material adverse change" has spawned numerous proposed definitions, summarized as follows:

- Michael Newbold, HNB's regional president for Indiana, who reviewed reports on the Greenwood Place Loans, testified that he could not identify any document that sets a guideline, standard, or rule for determining when a "material adverse change" has occurred in the financial condition of a guarantor, but that the determination was a "<u>matter of opinion…based on all of the facts that are involved</u>." He further testified that "<u>[i]t could be any one of a number of events that would have a considerable financial impact, such that we might suspect it could infringe upon repayment of loans to us</u>."

- Michael Lewis, HNB's senior vice president in charge of commercial lending with responsibility over the Greenwood Place Loans, testified that "<u>[e]verybody has their own measuring sticks as to what's material</u>" to an adverse change in a guarantor's financial condition, and agreed it is a "<u>you know it when you see it</u>" standard.

- Bradley Rust, who was HNB's relationship manager for the Greenwood Place Loans and is now responsible for managing those loan accounts, testified that he is not aware of any objective definition of the term "material adverse change in financial condition" as used in Section 8.01(l) of the MLA. Subjectively, Rust's opinion was that a material adverse change in the financial condition of a guarantor occurs when his "<u>net worth has eroded, when his income has eroded…[t]o a point where …it's questionable whether he can service his debt payments…without any kind of…additional cushion</u>."

- Thomas Peacock, who was HNB's team leader with responsibility over the Greenwood Place Loans at the time the MLA was negotiated, testified that he was not aware of any objective standard for "material adverse change," but that it was "<u>a subjective decision</u>" and a "<u>you know it when you see it sort of thing</u>."

- Michael Marack, HNB's portfolio manager for the Greenwood Place Loans, who worked with counsel to prepare the MLA, agreed there is no objective standard for determining when there has been a "material adverse change" in the financial condition of a guarantor under § 8.01(l) of the MLA. On this point, he testified,

8

- "[m]y opinion of it is any change adverse with…the guarantor…wherein…his financial capacity…is adversely affected…".

- By way of affidavit, Mr. Broadbent testifies that he "understood" the phrase to mean <u>"a change in [the Guarantor's] net worth to the point where it has become improbable that [he] could pay [his] guaranty obligation if a particular [B]orrower under the MLA defaulted on its loan.</u>[5]

In essence, Lenders urge the Court to accept a "know it when you see it" interpretation.[6] The Court is uncomfortable with the idea of applying such an approach at the summary judgment stage.

This discomfort is compounded by the fact that "materiality" is an inherently amorphous concept. Stated differently, when it comes to materiality, it's all relative. For instance, a loss of $10,000.00 would certainly be material – perhaps even devastating – to a person near the median income, but it would be nothing more than a tiny blip on the radar of a multi-billionaire. Given the "sliding scale" nature of materiality, coupled with the lack of a definition or objective standard found in the MLA, the Court cannot help but find that the term is ambiguous because reasonable people could come to different conclusions about its meaning. *See Pinkowski v. Calumet Twp. of Lake County*, 852 N.E.2d 971, 981 (Ind. Ct. App. 2006). The Court finds this term to be ambiguous; therefore, "an examination of relevant extrinsic evidence is appropriate in order to ascertain the parties' intent." *BKCAP, LLC v. CAPTEC Franchise Trust 2000-1*, 572 F.3d 353, 359 (7th Cir. 2009) (reversing summary judgment; plain language of mortgage finance

---

[5] Lenders contend that Mr. Broadbent's affidavit should be ignored because it conflicts with his earlier deposition testimony that he "did not know" what the term "material adverse change" meant. *See Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir. 1999) (when a conflict arises between a sworn deposition and a sworn affidavit, the deposition testimony overrides the affidavit). Given that this is an ancillary issue that does not meaningfully affect the Court's conclusion, it has opted not to address it in detail.

[6] In Justice Potter Stewart's concurrence in the landmark obscenity case of *Jacobellis v. Ohio*, 378 U.S. 184 (1964), he famously quipped that although "hard-core pornography" was hard to define, "I know it when I see it." *Id*. at 197. For obvious reasons, however, these cases are distinguishable and, in the Court's view, a "know it when you see it" approach is more difficult to apply in the present context.

loan agreements was ambiguous, requiring examination of extrinsic evidence in borrowers' action against lender seeking declaratory judgment as to correct interpretation of "prepayment premium" provision); *see also Capital Justice, LLC v. Wachovia Bank, NA*, 706 F. Supp. 2d 23, 29-30 (D.D.C. 2009) (deeming ambiguous the term "material adverse change in the capital, banking and financial market conditions that could impair the sale of the loan by Lender…").[7]

Moreover, as an important practical matter, Broadbent still has a net worth of roughly $48 million. This exceeds the amount of forthcoming judgments against Mr. Broadbent by over $25 million ($48 million - $22.75 million).[8] So, assuming these judgments will reduce Mr. Broadbent's net worth down to $25.25 million, he should still have room to absorb any guaranty liability stemming from the Greenwood Place Loans, which could be up to $4.9 million. This cushion creates questions as to whether the adverse change in Mr. Broadbent's financial condition is, in fact, *material*.[9]

A remaining issue relates to liquidity. Lenders contend that Mr. Broadbent has failed to maintain $2 million in liquid assets in violation of Section 2(d) of the Guaranty (i.e. the "liquidity covenant"). A liquid asset is one that is "capable of being readily converted into cash." BLACK'S LAW DICTIONARY 432 (3d pocket ed.). Mr. Broadbent, while certainly short on cash, has presented evidence that he has ready access to over $2 million cash by drawing on a

---

[7] Indiana courts have often held that the issue of *materiality* – albeit in different legal contexts – is generally a question of fact. *See, e.g., Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 175 (Ind. Ct. App. 2007) ("whether a breach is material is generally a question of fact to be decided by the trier of fact."); *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 673 (Ind. 2007) (materiality of misrepresentation or omission "is a question of fact to be resolved by the factfinder unless the evidence is such that there can be no reasonable difference of opinion.").

[8] In their reply brief, Lenders state that Mr. Broadbent's true maximum exposure is about $27 million. (Dkt. 117 at 8). Even if accurate, this fact would not affect the Court's ruling on the present motion.

[9] Lenders also use their reply brief to argue that Mr. Broadbent is "equitably insolvent" because he is unable to pay debts as they come due. (Dkt. 117 at 9-10). The Court is not yet persuaded at this time, and believes that this is an issue better suited for trial.

line of credit from his wife, by obtaining cash from partnerships under his control, by selling certain partnership properties, and/or by selling assets that are readily convertible to cash. In the Court's view, this evidence creates issues of material fact as to whether Mr. Broadbent has breached the so-called "liquidity covenant." For the reasons set out above, Lenders' Motion for Summary Judgment (Dkt. 99) is **DENIED**.

**C.     Final Judgment**

Given the Court's ruling, it must now address the Lenders' pending Fed. R. Civ. P. 54(b) motion. The Lenders' request entry of a final and appealable judgment on the Court's January 25, 2011 ruling ("prior ruling"), which held that Lenders were *not required* to make a $2.4 million loan to Greenwood Place.

To understand this issue fully, a brief review of this case's procedural history is instructive. Following the prior ruling, the Court immediately entered final judgment. However, because the prior ruling did not resolve the Counterclaim now at issue, the Court reopened the case on February 10, 2011. Over two months later, on April 20, 2011, Lenders filed a "Motion for Entry of Final Judgment" relating to the prior ruling.

This delay is fatal to Lenders' motion. In *Schaeffer v. First National Bank of Lincolnwood*, 465 F.2d 234 (7th Cir. 1972), the Seventh Circuit held that, generally, "it is an abuse of discretion for a district judge to grant a motion for a Rule 54(b) order when the motion is filed <u>more than thirty days</u> after the entry of adjudication to which it relates." *Id*. at 236 (emphasis added). In doing so, the Seventh Circuit also carved out an exception, recognizing that the general rule may not apply in cases of "extreme hardship" where the "dilatoriness is not occasioned by neglect or carelessness," but cautioned that such instances will be "extremely rare." *Id*. Lenders contend that they satisfy the "extreme hardship" exception. But this argument

rings hollow in light of the nature of the prior ruling. As mentioned, the prior ruling held that Lenders were *not required* to make a $2.4 million loan to Greenwood Place. It is not as if, for instance, Lenders were awarded a big money judgment on which they cannot execute until final judgment is entered. In the Court's view, the present case does not present the type of "extreme hardship" that the Seventh Circuit had in mind. Additionally, the Court believes that denying the present motion promotes judicial economy by potentially avoiding piecemeal appeals – even if there are few overlapping factual or legal issues between the prior ruling and the Counterclaim. Accordingly, Lenders' Motion for Entry of Final Judgment is **DENIED**.

## IV. CONCLUSION

For the reasons set forth above, Lenders' Motion for Summary Judgment (Dkt. 99) and Motion for Entry of Final Judgment (Dkt. 107) are **DENIED**.

SO ORDERED.

Date: 07/19/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution attached.

DISTRIBUTION:

Rex E. Bennett
FROST BROWN TODD LLC
rbennett@fbtlaw.com, vhilgert@fbtlaw.com

Jacob V. Bradley
FROST BROWN TODD LLC
jbradley@fbtlaw.com, award@fbtlaw.com

Darren Andrew Craig
FROST BROWN TODD LLC
dcraig@fbtlaw.com, jwhitaker@fbtlaw.com

Phil L. Isenbarger
BINGHAM MCHALE, LLP
pisenbarger@binghammchale.com, jibsen@binghammchale.com

Richard A. Kempf
TAFT STETTINIUS & HOLLISTER LLP
rkempf@taftlaw.com, docket@taftlaw.com, kmickel@taftlaw.com

Nathan Lee Lundquist
BINGHAM MCHALE LLP
nlundquist@binghammchale.com

James M. Matthews
FROST BROWN TODD LLC
jmatthews@fbtlaw.com, dacree@fbtlaw.com

Whitney L. Mosby
BINGHAM MCHALE LLP
wmosby@binghammchale.com, mmcclain@binghammchale.com

Peter Jon Prettyman
TAFT STETTINIUS & HOLLISTER LLP
pprettyman@taftlaw.com, docket@taftlaw.com, pkeener@taftlaw.com

Thomas C. Scherer
BINGHAM MCHALE LLP
tscherer@binghammchale.com, mmcclain@binghammchale.com

Steven C. Shockley
TAFT STETTINIUS & HOLLISTER LLP
sshockley@taftlaw.com, docket@taftlaw.com, kmickel@taftlaw.com